## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DONNA BOYLE,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:12-1122** |
| | : | |
| **v.** | : | |
| | : | **(JUDGE MANNION)** |
| **PHARMERICA DRUG** | | |
| **SYSTEMS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

# M E M O R A N D U M

Plaintiff Donna Boyle was an employee of defendant PharMerica Drug Systems, which filled prescriptions for nursing homes and other institutions. She was a pharmacy technician. Defendant had a system by which it could dispense controlled substances without a prescription on an emergency basis. PharMerica employees would then seek signatures from physicians for those substances dispensed on an emergency basis. Plaintiff's task at work was often to procure these signatures. However, on April 12, 2011, plaintiff was assigned to work on a different task. Plaintiff went into her supervisor's office and gave her 56 unsigned-for emergency prescription labels. Thereafter, on April 20, 2011, plaintiff was terminated. Plaintiff contends that after she was fired, she was replaced by a younger individual, and that she was treated less favorably than younger employees. She then brought suit pursuant to the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA").

## I.    BACKGROUND[1]

Plaintiff Donna Boyle was hired by PharMerica in 1994, and over the course of her employment there she held various job titles at the company's Wilkes-Barre, Pennsylvania facility. For the times relevant to this matter, she was a "Pharmacy Technician II." Throughout her time at PharMerica, her performance reviews indicated that she was satisfactory, although her last review indicated that she needed improvement in the areas of training and motivating new employees and working her assigned schedule as planned. Plaintiff is not a licensed pharmacist.

She reported to Pharmacy Technician Supervisors Melissa Leeper and Crystal Rinehamer. She also reported to Rae Ann Lech, the Pharmacy Director, who in turn reported to Michael Samueloff, Regional Director of Pharmacy. Mr. Samueloff had responsibility for a number of PharMerica sites, and did not work on-site at the Wilkes-Barre facility. PharMerica had a "progressive discipline" policy, which was explained in the employee handbook. The policy states that the steps in the program are "guidelines only," and that supervisors had discretion in employing the steps of the discipline policy. (Doc. 31-8, at 120). The policy also states that cases of "gross or serious misconduct" could result in immediate separation from

---

[1]Unless otherwise noted, facts are taken from defendant's, (Doc. 32), and plaintiff's, (Doc. 36), statements of material facts. Disputed facts are noted.

employment. Id.

Plaintiff was forty-five years old in April 2011. Around that time, she worked most frequently in the control room, where controlled substances were stored. She usually worked there by herself. PharMerica was permitted to dispense controlled substances on an emergency basis without a physician signature under certain circumstances. Sometimes, a nursing home would indicate that it needed a controlled substance it did not have, in which case a pharmacist at PharMerica would contact a physician to confirm the order, and then prepare and deliver the medication without a written prescription. A PharMerica worker would later fax the label to the physician to obtain a signature. Until a signature was received, a fax form was retained so that pharmacists and pharmacy technicians could determine which prescriptions still needed signatures.

Other times, emergency prescriptions would be filled through use of an "e-kit," which was at the site of the nursing home and which contained various controlled substances. If a patient needed such medication, the nursing facility would contact a physician, who would verbally order the medication. A pharmacist would confirm the order, and then give the nursing home employee permission to break the lock on the e-kit to obtain the medication. The e-kit would then need to be replaced, and the opened one would be processed. A label for the medication used would be created and faxed to the physician for signature. Once a signature for an emergency controlled

3

substance prescription was received, it would be filed by number in the same manner as other prescriptions issued from the facility. Defendant states that these fax forms were placed in a file, while plaintiff contends that some of these forms were kept in a "tote," or container, and that pharmacists knew that labels in the tote needed signatures. (Doc. 31-4, at 19).

While PharMerica was awaiting signatures, the faxes were kept in a physical folder. Rae Ann Lech and Dave Fleury, another pharmacist, prepared a weekly report of any prescriptions in the folder which had not been signed for seven days. If PharMerica failed to have these prescriptions signed within seven days, it was subject to Drug Enforcement Agency ("DEA") fines or the possibility of losing its license to dispense controlled substances. Most days from late 2010 through April 2011, plaintiff worked in the control room, and faxed unsigned prescriptions and called doctors to follow up on receiving signatures. (Doc. 31-4, at 23). Ms. Boyle was aware that the DEA could impose fines for non-compliance with obtaining physician signatures timely, but testified that she was not aware the pharmacy could lose its controlled substances license. (Doc. 36-5, at 59-60).

While plaintiff usually worked in the control room, she was sometimes assigned to complete other tasks, like label and put away prescription orders, or participate in a "power hour," during which many employees would work together to fill large prescription orders. (Doc. 31-4, at 13). On April 12, 2011, plaintiff arrived for work, but instead of being assigned to the control room as

4

she expected, she was assigned by Melissa Leeper to "run the cycle," a task which was usually completed by another pharmacy technician. This entailed filling prescriptions for the residents of a nursing facility on a monthly basis, rather than on an as-needed or emergency basis. Plaintiff told Ms. Leeper that running the cycle "was not her job" and that "the person whose job it is should be doing it." Plaintiff then began to run the cycle as directed. She was called into Rae Ann Lech's office shortly thereafter, and was asked whether she had told Ms. Leeper that she intended to call off work the next day because she was unhappy with being assigned to run the cycle. She denied making any such statement.

Plaintiff then returned to work on the cycle, but after a time, she went to the control room and retrieved a tote full of unsigned controlled substance prescription labels. She took the tote into Lech's office, where Ms. Lech and Suzanne Berdy,[2] a pharmacy operations support staff member based in Harrisburg who was temporarily assisting the Wilkes-Barre facility at that time, were present. Plaintiff placed the tote on Ms. Lech's desk, and informed Ms. Lech that the physician signatures needed to be obtained for the labels. She testified that "they gave me their work to be done and I gave them my work to be done." (Doc. 31-4, at 19). During this conversation, plaintiff also asked

---

[2]Ms. Berdy is the mother of Melissa Leeper. Although plaintiff finds this fact significant, she has failed to identify any way that the relationship between the two women affected her or her employment. The court does not find this fact to be material to the matters in question in this case.

about the possibility of going to part-time work and complained that the new employees get what they want while people who have worked at the company for some time do not. (Doc. 31-7, at 8). Ms. Lech and Ms. Berdy felt that plaintiff's communication with them was unprofessional. (Doc. 31-8, at 3; Doc. 31-11, at 3).

Ms. Lech's review of the contents of the tote revealed 56 unsigned labels, which were more than fourteen days old. They had not been reported, and defendant claims that because they were not in the usual folder from which Ms. Lech and Mr. Fleury compiled the weekly report, they had no way to know that the prescriptions existed or were overdue. Plaintiff disputes that they were overdue, or that if they were, that it was her fault. Plaintiff testified that she informed Dave Fleury about the overdue prescriptions before April 12, 2011, and that he chose to disregard them. Mr. Fleury denies that he knew the prescriptions were overdue before April 12, 2011.

Ms. Lech and Ms. Berdy informed Mike Samueloff of their interaction with plaintiff, and he recommended that they give plaintiff a final written warning for insubordination and inappropriate communication. (Doc. 31-7, at 8-9). Ms. Lech discussed the issue with Ms. Berdy, who prepared a final written warning to plaintiff for the April 12, 2011 insubordination and inappropriate communication. (Doc. 36-8, at 2-3). The warning was given to plaintiff on the afternoon of April 12, 2011. A week later, on April 19, 2011, Ms. Lech, Ms. Berdy, and Mr. Samueloff exchanged more emails about the

incident. Mr. Samueloff indicated that he was thinking that the lateness of the 56 prescriptions warranted terminating plaintiff's employment, and asked questions of Ms. Lech regarding the incident and the appropriateness of termination. Mr. Samueloff learned that an employee at another PharMerica facility had been fired for a similar issue occurring with four prescriptions. (Doc. 31-7, at 6). He discussed the issue with the Director of Human Resources on that day, and recommended terminating Donna Boyle. He also recommended a verbal warning for Rae Ann Lech because she had not maintained enough control over the process for unsigned prescriptions, for which she had accountability, and which was important to PharMerica being able to continue dispensing controlled substances.

The next day, plaintiff was working with Joshua Turel, a staff pharmacist. She told Mr. Turel that she was surprised that she had not been fired for the incident with the 56 prescriptions. Mr. Turel reported this comment to Ms. Lech, who reported it to Ms. Berdy, who in turn relayed it to Mr. Samueloff. (Doc. 31-7, at 17). Plaintiff testified that she does not recall whether she made that statement to Mr. Turel. (Doc. 36-5, at 95-96). Mr. Samueloff then decided to move forward with her termination. Plaintiff was fired on April 20, 2011, with PharMerica citing the importance of the process and the potential severity of DEA repercussions for having unsigned prescriptions, and plaintiff's failure to carry out her responsibilities, of which PharMerica felt she was aware, as the reason for her termination. Plaintiff

7

refused to sign her discharge form, so Josh Turel, who was present at the termination meeting, signed as witness. (Doc. 31-8, at 60-61).

Plaintiff was forty-five at the time of her termination, and was replaced by a man who was approximately twenty-nine years old. Plaintiff alleges that the pharmacists at the facility, including Rae Ann Lech and Josh Turel, were younger than her, and were not disciplined for the incident with the 56 prescription labels despite being, in plaintiff's view, the ones ultimately responsible for obtaining the physician signatures.

Plaintiff also complained that she and other older workers were treated unfavorably compared to younger workers as to being allowed to use vacation time. In November of 2010, workers were informed that PharMerica would be bringing on four new nursing homes as clients, and that taking vacation time would not be allowed. (Doc. 36-5, at 14). Plaintiff does not claim that she was denied any vacation, (Doc. 36-5, at 28-29), and the time sheets from that period reflect that she took a vacation day on March 11, 2011. (Doc. 31-8, at 42). Janice Lamb, another pharmacy tech, who was younger than plaintiff, took several vacation days in February of 2011. Ms. Lamb attempted to resign, but was talked into staying. (Id., at 38-40).

Plaintiff also complained that another younger employee, Mary Frable, was able to go to part time and then back to full time as she wanted. (Doc. 36-23). Plaintiff raised these complaints to Rae Ann Lech during her performance review on April 6, 2011, and Ms. Lech conveyed plaintiff's complaints to Mr.

8

Samueloff.  (Id.).

Plaintiff also identifies Melissa M. as an employee younger than her who she believes received better treatment. Melissa M. punched a hole in a wall after she was told about the new vacation policy in November 2010. Melissa M. was given a warning for that behavior, but was not terminated. Plaintiff has not identified any age-based comments made by Rae Ann Lech, Sue Berdy, or Mike Samueloff. Plaintiff testified that at some point in early 2011, Melissa Leeper was showing a new employee around the facility and stated that plaintiff was one of the "oldest, longest-working employees in the facility." (Doc. 31-4, at 30). Mr. Samueloff is older than plaintiff, and Rae Ann Lech is younger than plaintiff. At the time of her termination, several employees of the Wilkes-Barre PharMerica location were older than plaintiff.

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, and the file on the charge was closed March 19, 2012. (Doc. 31-16). Plaintiff filed her complaint in this court on June 13, 2012. (Doc. 1). Defendant has moved for summary judgment, (Doc. 30), and has briefed its motion. (Doc. 31, Doc. 38). Plaintiff has opposed the motion. (Doc. 35). Plaintiff brings claims under the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA").

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; *see also* Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party

can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (*quoting* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

## III.    DISCUSSION

ADEA claims are evaluated under the burden shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). *See* Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005). PHRA claims are properly treated as coextensive with ADEA claims. Vuong v. Management of J.C. Penney's Co., 169 F.App'x 675, 677 (3d Cir. 2006)(*citing* Kelly v. Drexel Univ.,

11

94 F.3d 102, 105 (3d Cir. 1996)). Under McDonnell Douglas, the plaintiff bears the burden of proof as well as the initial burden of production, and must first demonstrate a prima facie case of discrimination. Smith v. City of Allentown, 589 F.3d 684, 689 (3d Cir. 2009). To demonstrate a prima facie case, the plaintiff must show: "first, that the plaintiff is forty years of age or older; second, that the defendant took an adverse employment action against the plaintiff; third, that the plaintiff was qualified for the position in question; and fourth, that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus." Id. (*citing* Potence v. Hazleton Area Sch. Dist., 357 F.3d 366, 370 (3d Cir. 2004)). The burden of showing a prima facie case is not intended to be onerous. Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995).

If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to identify a legitimate non-discriminatory reason for the employment action. Id. at 690 (*citing* Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997). If the employer identifies a non-discriminatory reason for the adverse employment action, the burden of production returns to the plaintiff to demonstrate that the reason offered by the employers is merely pretextual. Id. (*citing* Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1095 n. 4 (3d Cir. 1995)).

Here, there is no dispute that a prima facie case of discrimination has been made - plaintiff was over forty and qualified for her position when she

was terminated and replaced by an employee in his late twenties. Next, under the McDonnell Douglas analysis, the defendant must identify a legitimate non-discriminatory reason for the employment action. The defendant's burden is "relatively light," and a defendant can establish a legitimate reason, "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

Here, defendant contends that plaintiff was fired because she was the primary employee responsible for keeping track of the unsigned controlled substances prescriptions, and allowed fifty-six prescriptions to go unsigned for two weeks without informing pharmacists or the pharmacy director that she was behind schedule or that there was a possible problem. The defendants produced undisputed evidence that plaintiff worked alone in the control room on most days, and that she had routinely worked on obtaining physician signatures for controlled substance prescriptions. Defendant has also produced evidence that it could face penalties, possibly severe ones, for failing to properly and timely obtain physician signature for emergency controlled substance prescriptions. This evidence, taken as true, permits the conclusion that plaintiff's performance of her job was insufficient in at least one significant respect. Poor job performance is a legitimate and nondiscriminatory reason for the termination of employment. Ross v. Gilhuly, 755 F.3d 185, 193 (3d Cir. 2014).

As defendant has been able to identify a legitimate non-discriminatory reason for the employment action, the burden shifts back to the plaintiff to demonstrate that the defendant's legitimate, nondiscriminatory reason was pretext for a discriminatory motive. Here, "the aggrieved employee must then proffer evidence that is sufficient to allow a reasonable finder of fact to find by a preponderance of the evidence that the employer's proffered reasons are false or pretextual." Fasold, 409 F.3d at184 (*citing* Sarullo v. United States Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003)). At this stage, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764.

To successfully illustrate grounds that the employer's articulated reasons should be disbelieved under the first part of the pretext standard, a plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" Id. (*quoting* Ezold v. Wolf, Block, Schorr & Solis–Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).Under the second part of the pretext standard, the plaintiff must demonstrate that discrimination was more likely than not the "but-for" cause of her termination from employment.

14

To do so, the plaintiff "cannot simply attempt to show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765. To demonstrate that an employer was motivated by a discriminatory reason despite its articulated reasons, the plaintiff could show, for example, "that the employer has previously discriminated against [her], that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998) (*citing* Fuentes, 32 F.3d at 765).

Plaintiff here has failed to demonstrate that defendant's nondiscriminatory reason for firing her was pretextual, or that it is more likely than not that her age was a motivating factor behind her termination.

Plaintiff extensively argues that the reason for her termination is pretextual because there was no written policy at PharMerica that identified the proper procedure for obtaining physician signatures for emergency controlled substance prescriptions. Plaintiff also argues that state laws make pharmacists, not pharmacy technicians like plaintiff, ultimately responsible for obtaining those signatures and keeping track of any outstanding ones. Plaintiff notes that the licensed pharmacists working at the Wilkes-Barre

15

facility, who are younger than plaintiff, were not disciplined for the failure to keep track of the fifty-six prescriptions, and that Rae Ann Lech, who had ultimate responsibility for the unsigned prescriptions at the Wilkes-Barre facility and who is younger than plaintiff, was only given a verbal warning over the April 12, 2011, incident with the prescriptions. Plaintiff further argues that the investigation into the incident on the part of Mike Samueloff and Rae Ann Lech was insufficient.

These arguments do not establish that defendant's proffered reason for firing plaintiff was pretextual. While plaintiff submits that the pharmacists should be the ones punished for the problem with the unsigned prescriptions, there is no evidence that the pharmacists were aware that there was a backlog with the prescriptions. While there was no written policy for the process of obtaining signatures, that does not detract from the copious evidence that plaintiff had been primarily responsible for the control room for some time and knew that she was responsible for providing support to pharmacists and informing them of potential problems. Defendant has stated that part of the reason it fired plaintiff was that it felt that she was aware of her responsibilities and had knowledge of the backlog and its seriousness. (Doc. 31-7, at 4).

While plaintiff testified that she told Dave Fleury that there was a tote full of unsigned prescriptions, Ms. Lech stated that she asked the pharmacists about whether they were aware of the situation, and all of them replied that

16

they were not. Even if Mr. Fleury was actually aware of the unsigned prescriptions before April 12, 2011, his supervisor, after asking questions, did not believe that he was. Ms. Lech determined that the fault for the incident rested with plaintiff. Defendant believed that plaintiff alone had knowledge of the late prescriptions, which explains why she was punished while others were not. Thus, there is no evident inconsistency or incoherency between plaintiff's punishment and the lack of punishment the pharmacists received.

Although plaintiff argues that the wrong person was blamed for the incident, or that others should have also been punished, at this stage of the McDonnell Douglas analysis, that would not be sufficient to show a discriminatory intent on the part of defendant. Richards v. Centre Area Transportation Authority, 2010 WL 411743, at * 9 (M.D. Pa. Jan 25, 2010). Plaintiff is simply arguing that the employer made the wrong decision. But even if we concluded that Ms. Lech's "investigation was faulty or its conclusions were wrong," it does not demonstrate that defendant's reason for firing plaintiff was fabricated, or that defendant had "any improper *mens rea*," or that plaintiff's age was a motivating cause in her firing. Id. Further, Mr. Samueloff became aware that another employee of PharMerica who worked at a different facility had been fired for a similar situation with far fewer unsigned prescriptions, and that there were no other similar incidents that had occurred at PharMerica facilities. (Doc. 31-7, at 6). He also represented that plaintiff and this other employee were the only ones who had problems with

17

emergency prescription signatures, to his knowledge. This evidence demonstrates that defendant consistently dealt with such violations strongly, and considered them serious.

Moreover, Rae Ann Lech was, in fact, disciplined for failing to have in place a better policy to ensure that unsigned prescriptions did not exceed the seven day reporting period. While plaintiff believes that Ms. Lech received too light a punishment compared to her own termination, the facts do not support a finding that plaintiff was punished more severely than Ms. Lech because of her age. Indeed, Mr. Samueloff, who did not work on-site at the Wilkes-Barre facility, stated that he was not aware of plaintiff's age until after she was terminated, a contention that plaintiff has not countered. (Doc. 31-7, at 3).

Plaintiff's brief also disputes the very existence of the fifty-six unsigned prescriptions, as defendant has not produced them in this litigation. However, this is not a legitimate dispute. Plaintiff herself acknowledged the existence of the prescriptions when testifying about the events of April 12, 2011. While plaintiff argues that the fifty-six prescriptions have not been produced by defendant, that does not create a legitimate question of material fact. It is clear that a large number of unsigned prescriptions existed on April 12, 2011.

Similarly, plaintiff argues that the unsigned prescriptions cannot have actually been considered serious by defendant because "absolutely nothing was done by any of the pharmacists to obtain these prescriptions." (Doc.35, at 35). Plaintiff argues that because the pharmacy reported that fifty-six

18

prescriptions were still beyond the seven-day period on April 15, 2011 that there is evidence that nobody attempted to get signatures for those prescriptions between April 12 and April 15, 2011. However, this claim is unsupported, as the fact that the prescriptions were reported as unsigned does not mean that nobody attempted to obtain a signature. Further, it is contradicted by the testimony of Josh Turel, who averred that "[a]s soon as we found out about it, I believe we started faxing and calling physicians right at that point, multiple pharmacists." (Doc. 31-9, at 7).

Ms. Lech also represented that she and the other pharmacists working that day immediately began trying to obtain signatures for the overdue labels. (Doc. 31-11). Mike Samueloff's e-mail exchanges with Rae Ann Lech, which were sent before plaintiff was terminated, also chastise Ms. Lech for failing to keep track of the prescriptions, and reflect a view that timely obtaining the signatures was extremely important to defendant's business. Thus, there is no legitimate question as to whether PharMerica believed that the age of the emergency prescriptions was serious. The record shows that defendant believed that the issue was serious, and plaintiff has not raised legitimate questions as to the potential seriousness of the issue for the pharmacy.

Plaintiff attempts to show that she has been treated worse than similarly situated employees who are younger than she is. "While 'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar in 'all relevant respects.'" Opsatnik v. Norfolk Southern Corp., 335 F.App'x

19

220, 222-23 (3d Cir. 2009)(*quoting* Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir.1997)). The context of a case determines which respects are relevant, but in cases of disciplinary action, relevant context often means a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Id. (*citing* Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)).

Specifically, plaintiff points to Melissa M., who punched a hole in a wall at the Wilkes-Barre facility after becoming frustrated or upset at work. But, here, the comparison between Melissa M. and plaintiff is misplaced, as their conduct is so different that it does not admit of useful comparison. Here, Melissa M. punched a wall at work, and plaintiff contends that this is a more serious infraction than her own, yet Melissa received only a warning. However, the nature of the conduct of the two women, and the possible consequences of that conduct for PharMerica, are not alike. For instance, plaintiff has not demonstrated what sort of serious repercussions the pharmacy could face for an employee having an inappropriate outburst at work, while defendant did demonstrate that it could face fines or license suspension for having prescriptions go unsigned for too long. The potential consequences of the behavior to PharMerica are just one of the ways this conduct is not similar, and the court can not glean that there was pretext or

20

discriminatory intent at play in plaintiff's firing from the discipline meted out to Melissa M. under completely different circumstances.

Plaintiff also points to Janice Lamb and Mary Frable as younger employees who were given preferential treatment. She further points out that she complained about this to Rae Ann Lech during her performance review in April 2011.[3] But plaintiff has failed to identify any way in which Janice and Mary were treated more favorably. Plaintiff contends that Janice Lamb was allowed to take vacation time while other employees were not. However, plaintiff has not identified any instance in which she was denied vacation time, or in which other older workers were denied it, while younger workers were able to take it. And while plaintiff seems to argue that the fact that she had complained about the younger employees being treated more favorably before she was terminated proves that they were treated better, there is simply no evidence of that on the record before the court. Plaintiff has not demonstrated that younger employees received preferable treatment that was denied to her or other older employees.

In short, plaintiff's generalized complaints and allegations about the preferential treatment of younger employees are not supported by the evidence of record, and are insufficiently specific and concrete to defeat

---

[3]Plaintiff insinuates that her firing so soon after complaining during her performance review was an instance of retaliation. However, there is no retaliation claim in plaintiff's complaint, and is only hinted at in her brief. (Doc. 35, at 29). The court will thus not address retaliation.

summary judgment. Her other arguments that the reason for her firing was pretextual are similarly unavailing. There are no remaining questions of material fact as to whether plaintiff's termination was motivated by her age. Plaintiff's ADEA and PHRA age discrimination claims thus cannot survive defendant's motion for summary judgment, which is **GRANTED**.

## IV.    CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment, (Doc. 30), is **GRANTED**. The Clerk is directed to close the case. A separate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: November 6, 2014**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2012 MEMORANDA\12-1122-01.wpd